AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED BY _____ D.C.

APR 0 3 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

| | |
|---|---|
| United States of America<br>v.<br>MARYNA PETUSHKOVA and OLEKSII PETUSHKOV<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  24-6146-MJ-STRAUSS<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2021 through the present__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Sections 1956(h) | Conspiracy to Launder Monetary Instruments and Conspiracy to Engage in Monetary Transactions in Property Derived from a Specified Unlawful Activity |
| Title 18, United States Code, Sections 1960 | Operating a Money Transmitting Business Without a License |

This criminal complaint is based on these facts:

**See attached affidavit**

☒ Continued on the attached sheet.

*Complainant's signature*

FBI Special Agent Bert Ferguson
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. 4.1 by telephone or FaceTime

Date: April 3, 2024

*Judge's signature*

City and state: Fort Lauderdale, Florida

Hon. Jared Strauss, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Bert Ferguson, having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since 2018. I am currently assigned to the Transnational Organized Crime Section. As a Special Agent with the FBI, my duties and responsibilities include investigations and assisting with the prosecutions of individuals involved in money laundering, fraud, and sanctions evasion, among other criminal violations. I am empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18 and Title 21 of United States Code, among other violations.

2. The statements contained in this affidavit are based on my own personal knowledge, as well as other information provided to me by other law enforcement officers and employees of the FBI. I have not included in this affidavit each fact and circumstance known to me, but only the facts and circumstances that are sufficient to establish probable cause in the support of a criminal complaint.

## Violations of Law

3. This affidavit is written in support of a criminal complaint charging **MARYNA PETUSHKOVA** (hereinafter "**MARYNA**") and **OLEKSII PETUSHKOV** (hereinafter the "**OLEKSII**") with Conspiracy to Launder Monetary Instruments, in violation of Title 18 U.S.C. § 1956(h); Conspiracy to Engage in Monetary Transactions in Property Derived from a Specified Unlawful Activity, in violation of Title 18 U.S.C. § 1956(h); and Operating a Money Transmitting Business Without a License, in violation of Title 18 U.S.C. § 1960.

### Background

4. From in or about April 2018 through the present, **MARYNA** and **OLEKSII** own Trident Trade, Corp., in North Miami, Florida. **MARYNA** and **OLEKSII** purport that their business engages in tinting and vinyl wrapping for automobiles and automobile windows. As set forth in more detail below, the business is a front for an illegal money transmitting business that exchanges illegally obtained gift cards for cash, some of the cash was obtained from purported drug proceeds.

#### A. Applicable Federal Laws

5. Businesses that engage in redeeming money orders and other similar instruments, such as gift cards, for cash, are money transmitting businesses as defined in 31 U.S.C. § 5330(d)(1) and are required to register such businesses with the Secretary of the Treasury within 180 days from the date the business is established.

6. A search of pertinent records establishes that **MARYNA** and **OLEKSII** have never obtained a license to operate a money transmitting business from the Secretary of the Treasury.

#### B. Applicable Florida Laws

7. Under the laws of the state of Florida a person may not engage in a money services business unless the person is licensed or exempted from obtaining a license. Section 560.125(1) Florida Statute.

8. A "money services business" is defined as any person located in or doing business in this state, from this state, or into this state from locations outside this state or country who acts as a payment instrument seller, foreign currency exchanger, check casher, or money transmitter. Section 560.103 (23) Florida Statute.

9. A person who operates a money service business in the state of Florida without a license and the violation involves currency, monetary value, payment instruments, or virtual currency totaling or exceeding $100,000 in any 12-month period, commits a first-degree felony. Section 560.125(5)(c) Florida Statutes.

10. A search of Florida State records establishes that **MARYNA** and **OLEKSII** have never obtained a license to operate a money service business in the state of Florida.

### Probable Cause

### Report of stolen credit card information used to purchase gift cards later sold through a business owned by MARYNA and OLEKSII

11. On or about January 10, 2021, the Fridley Police Department (hereinafter "FPD") in Minnesota received a report of stolen credit card information used in a purchase at a local Target department store (hereinafter "Target"). Several gift cards were purchased at Target using a victim's credit card information. FPD detectives later obtained the gift card numbers that were activated using the victim's credit card. Upon further investigation, FPD detectives discovered that the gift cards activated at the Target, were sold to 3 Oceans, LLC, a business located in Hallandale Beach, Florida. According to records received by FPD, the gift cards were processed at 3 Oceans, LLC on January 29 and 31, 2021. FPD detectives contacted 3 Oceans, LLC, using a publicly listed phone number, and made contact with a person identifying herself as **MARYNA**. FPD detectives asked **MARYNA** about the gift cards that were allegedly sold, to which she responded that 3 Oceans, LLC, was a vinyl wrapping and car window tint business. **MARYNA** told FPD investigators that she had no knowledge of the gift cards being sold at her business, and when asked about surveillance cameras, she advised that videos from the requested dates had already been expunged from her system.

### Witness reports suspicious financial activity from MARYNA and OLEKSII

12. Since on or about January 2023, I have participated in an investigation of money laundering and other criminal activities committed by **MARYNA**, **OLEKSII**, and other co-conspirators.

13. On or about January 2023, law enforcement agents interviewed a witness who reported suspicious financial activity related to several businesses owned and operated by **MARYNA** and **OLEKSII**. The witness was employed by a financial institution (hereinafter the "Financial Institution"), of which **MARYNA** and **OLEKSII** had previous business bank accounts. The witness reported multiple suspicious transactions that occurred during 2021 between **MARYNA's** and **OLEKSII's** bank accounts at the Financial Institution and bank accounts at other financial institutions. The suspicious financial activity included cash deposits made in amounts under $10,000 in order to evade the currency transaction reporting requirements, as well as several large wire transfers to other financial institutions with no records supporting any legitimate purpose for the transactions.

14. As part of his/her official duties, the witness conducted an interview with **MARYNA** and **OLEKSII**. The witness reported that **MARYNA** and **OLEKSII** did not provide documentation explaining the suspicious transactions that were made with their accounts. The witness identified companies owned and operated by **MARYNA** and **OLEKSII** wherein there were suspicious financial transactions.

### CHS1's Initial Meeting with MARYNA and OLEKSII

15. Pursuant to investigative strategy, on or about June 2023, law enforcement sent a Confidential Human Source (hereinafter "CHS1") to meet in an undercover capacity with **MARYNA**, in order to inquire about her gift card business. On or about July 18, 2023, CHS1

consensually audio and video recorded an in-person meeting with **MARYNA** and **OLEKSII** at a restaurant in Fort Lauderdale, Florida. During the meeting, **MARYNA** and **OLEKSII** revealed that they operated a business that purchased large quantities of gift cards. **MARYNA** and **OLEKSII** revealed that their business bank accounts had been closed several times by financial institutions in the past due to suspicious activity. **MARYNA** and **OLEKSII** told CHS1 that in order to operate their business, they needed large quantities of cash in order to purchase stolen or fraudulently obtained gift cards. **MARYNA** and **OLEKSII** further stated that they needed to avoid the use of banks. **MARYNA** stated, "we can't withdraw money from our banks, a lot of accounts have been closed for us." **OLEKSII** stated, "this is money laundering."

16. **MARYNA** stated, "…a couple of times the police called…asking about some money order, what kind of fraud." **OLEKSII** stated, "but we have a cover." **MARYNA** stated, "Two times when the police dialed and said 'money order fraud' I was so surprised like, 'really money order is fraud?' How is it possible? Etc."

17. **MARYNA** and **OLEKSII** later revealed to CHS1 that from the funds they obtained from their gift card business, they purchased four residential properties in the Broward County area. **OLEKSII** stated, "thanks to the cards, we got our homes."[1]

18. Pursuant to investigative strategy, CHS1 told **MARYNA** and **OLEKSII** that he/she had the capability of obtaining large quantities of gift cards, as well as being able to provide bulk cash.

---

[1] Law enforcement obtained records of purchases of four properties in Broward County by **MARYNA** and **OLEKSII**, two in 2020, one in 2022, and one in 2023.

5

### Laundering of gift card funds for CHS1 through MARYNA and OLEKSII

19. In order to facilitate the investigation, arrangements were made with a commercial gift card supplier to purchase gift cards to be used in the investigation. These "gift cards" were to be provided to **MARYNA** and **OLEKSII** and were represented either to have been stolen or fraudulently acquired. The FBI obtained $10,000 worth of gift cards to be used in the investigation.

20. On or about October 6, 2023, CHS1 conducted a consensually audio and video recorded meeting with **MARYNA** and **OLEKSII** at a restaurant in Fort Lauderdale to conduct a "gift card drop." During the meeting, CHS1 introduced an additional Confidential Human Source (CHS2) with the intention of presenting him as an associate involved in Automated Teller Machine (ATM) skimming, which included the use of electronic card readers to indiscriminately steal credit card information from victims. CHS1 presented $10,000 worth of gift cards and asked, "does it make any difference to you the source of the money or not?" **OLEKSII** stated, "we don't ask about that...we don't ask." **MARYNA** and **OLEKSII** accepted the gift cards from CHS1 and agreed to pay him/her 80 percent of the card's value in cash at a later time.

21. On or about October 12, 2023, CHS1 conducted a consensually audio and video recorded meeting with **MARYNA** and **OLEKSII** at a restaurant in Fort Lauderdale to pick up cash from the previous gift card drop. CHS1 told **MARYNA** and **OLEKSII**, "someone stole this money, then bought the cards I gave you...what are you going to do with those stolen cards? Do you throw it away? Destroy it?" **MARYNA** replied, "We throw it away...I sold them, they paid for them. Basically, I don't need them, and I throw them away." CHS1 told **MARYNA** and **OLEKSII** that, "I understand what you're worried about, so that there is no question of what I threw you and when you will give me the money." CHS1 then spoke about bulk cash that he/she intended to provide to **MARYNA** and **OLEKSII** at a later time. CHS1 told **MARYNA** and

**OLEKSII**, "Sometimes I f***ing look at these people, how much they make on 'powder' (i.e. cocaine). I take money from them for you. They're shoveling money." **OLEKSII** then told CHS1 that they were "a little worried" and asked CHS1 if he worked with law enforcement. CHS1 asked, "have you had any problems with law enforcement?" **OLEKSII** told CHS1, "That is why we have official businesses, which, in fact, do not bring any money, but provide some kind of cover."[2] **OLEKSII** then proceeded to hand CHS1 cash concealed in a napkin, which amounted to $7,920 and a returned gift card.

22. On or about October 17, 2023, CHS1 provided $5,000 worth of gift cards to **MARYNA** and **OLEKSII** through pictures via a Telegram chat that included CHS1, CHS2, **MARYNA**, and **MARYNA**'s associate in Ukraine, Mariana (last name unknown). **MARYNA** told CHS1 that Mariana had the capability to process the cards using only the numbers provided in a photograph if the gift cards were American Express gift cards, and needed physical cards if the cards were Vanilla Visa gift cards. **MARYNA** accepted some of the gift cards provided by CHS1 but requested that he provide the rest of them in person at a later time. On or about October 20, 2023, CHS1 met with **OLEKSII** at a liquor warehouse in Hallandale Beach, Florida. CHS1 provided the remainder of the $5,000 worth of gift cards to **OLEKSII**, who told CHS1 that he would receive cash at a later time. On or about October 24, 2023, CHS1 met **MARYNA** at the Trident Trade, Corp., and received $4,000 in cash from her.

---

[2] Based on information received from CHS1 and from the bank account records, the vinyl wrapping and car window tinting business is just used as a cover to hide the unlawful activities associated with the gift card business. Researching the **TARGET BUSINESS** reflects three reviews for the business. One review from a year ago gave the business one star and said that the person would never use the business again. The other two reviews were written by **OLEKSII** and a coconspirator employee, (hereinafter the "Employee Coconspirator"). They gave their own business five stars. **OLEKSII** wrote eight reviews and the Employee Coconspirator wrote 23 reviews. Their reviews did not state their relationship to the business.

7

23. On or about October 30, 2023, CHS1 provided an additional $5,000 worth of gift cards via the aforementioned Telegram chat with **MARYNA** and **OLEKSII**. On or about November 20, 2023, CHS1 arrived at the office of Trident Trade, Corp., and conducted a consensually audio and video recorded meeting with **MARYNA**. **MARYNA** requested banking information from CHS1 in order to send automated clearing house (ACH) transfers and wire transfers into his/her account for the gift cards. CHS1 provided **MARYNA** with account information from a United States government controlled undercover bank account. **MARYNA** discussed doubting CHS1's credibility in past meetings stating, "we don't have to doubt. You were worried, we were worried too." CHS1 told **MARYNA**, "I'm risking the most here." **MARYNA** told CHS1, "not really, because I sell the cards officially, and you give me the cards as if unofficially…I know what I can say." CHS1 then walked with **MARYNA** into the office of Trident Trade, Corp. CHS1 also observed a small safe, which **MARYNA** opened to retrieve $2,000 in cash. Inside the safe, CHS1 observed a large quantity of gift cards. **MARYNA** gave CHS1 $2,000 in cash and agreed to later send him/her $2,000 via ACH transfer into CHS1's bank account. An ACH transfer of $2,000 was later made from a business account controlled by **MARYNA** and **OLEKSII** into a government controlled undercover account.

**Laundering of bulk cash simultaneous with gift cards through MARYNA and OLEKSII**

24. Pursuant to investigative strategy, law enforcement obtained $150,000 in U.S. currency which would be represented to **MARYNA** and **OLEKSII** as proceeds from illegal narcotics trafficking.

25. On or about November 28, 2023, CHS1 conducted a consensually audio and video recorded meeting with **MARYNA** and the Employee Coconspirator inside of the office of Trident Trade, Corp. CHS1 provided $50,000 in U.S. currency to **MARYNA**, and told her, "I told you

8

openly that it's money from cocaine." **MARYNA** told CHS1, "That's what I don't like." CHS1 explained to **MARYNA** that the money would not be traced back to her. **MARYNA** stated, "I understand, you just understand when you don't know that it's kind of on the other side." CHS1 replied, "When we talked the first time you asked me to be open with you. Did I explain to you where this money came from?" **MARYNA** stated, "Yeah." **MARYNA** accepted the money and proceeded to place the cash through a digital money counter. The Employee Coconspirator was in the office processing gift cards. **MARYNA** told CHS1 that she would send either ACH transfers or wire transfers to CHS1's bank account, in increments adding up to $50,000, plus 0.8 percent. Between November 29, 2023, and December 6, 2023, **MARYNA** sent six ACH transfers totaling $50,400 from a business account controlled by **MARYNA** and **OLEKSII** to a United States government undercover bank account.

26. On or about December 7, 2023, CHS1 conducted a consensually audio and video recorded meeting with **MARYNA** and the Employee Coconspirator inside of the office of Trident Trade, Corp. CHS1 provided $3,000 in gift cards and $100,000 in cash to **MARYNA**. CHS1 told **MARYNA**, "My partners are happy…you're so fast." **MARYNA** told CHS1, "Come on, 50, I don't want 100." CHS1 told **MARYNA**, "Take all 100 of them and then give them back when you have them." **MARYNA** asked, "100?" CHS1 told **MARYNA**, "Yes." **MARYNA** told CHS1, "Good." **MARYNA** accepted both the gift cards and cash. **MARYNA** told CHS1 she would give him/her 80 percent for the gift cards in cash and would provide a combination of ACH transfers and wire transfers to CHS1's bank account at a later time. The Employee Coconspirator processed the gift cards provided by CHS1 using a card reader and a laptop, counted $2,400 and handed CHS1 $2,400 for the gift cards on behalf of **MARYNA**. Between December 12, 2023, and December 26, 2023, **MARYNA** sent three ACH transfers and three wire transfers totaling

9

$100,800 from a business account controlled by **MARYNA** and **OLEKSII** to a United States government controlled undercover bank account.

27.  On or about December 20, 2023, CHS1 conducted a consensually audio and video recorded meeting with **MARYNA** and **OLEKSII** at a restaurant in Fort Lauderdale. During the meeting, CHS1, **MARYNA**, and **OLEKSII** discussed the origins of funds for the gift cards purchased at the office of Target Trade, Corp., as well as the origins of the cash provided by CHS1. CHS1 purported wanting to use funds from money laundering to obtain a mortgage. **MARYNA** told CHS1, "When we got loans for homes, we said we were in the business of selling gift cards, and for them it was fine." CHS1 stated, "Well, come on, I think everyone doesn't know that a gift card is bought with stolen money." **OLEKSII** replied, "Well, yes." CHS1 proceeded to give **MARYNA** and **OLEKSII** $4,000 worth of gift cards, of which they accepted. CHS1 told **OLEKSII**, "I remembered when I was at your place, when I brought cash, I saw that black guy there, I said, you know who comes to you, because, well, let's be honest they are stealing the money and then buy cards." **MARYNA** replied, "But that's understandable, yes." **OLEKSII** replied, "But we never ask, if you haven't asked, you don't know the answer." **MARYNA** then told CHS1 that she was afraid to take cash from him because "she knew where this money came from." **OLEKSII** told CHS1, "You don't say where and what you get, we already know." CHS1 replied, "That's what I said once and that's it." **OLEKSII** replied, "Don't say that again, I'm just starting to get nervous." CHS1 offered to provide more cash to **MARYNA** and **OLEKSII**.

MARYNA told CHS1 to meet at the office of Trident Trade, Corp., the following day with the cash.[3]

28. On or about December 21, 2023, MARYNA directed CHS1 to meet with MARYNA and the Employee Coconspirator inside of the office of Trident Trade, Corp., which meeting was consensually audio and video recorded. CHS1 provided $100,000 in cash to MARYNA. MARYNA accepted the cash and placed it through a digital money counter. The Employee Coconspirator then gave CHS1 $3,200 for the previous gift card drop. Between December 27, 2023, and January 17, 2024, MARYNA sent three ACH transfers and three wire transfers totaling $100,800 from a business account controlled by MARYNA and OLEKSII to a United States government controlled undercover bank account.

29. On or about January 8, 2024, CHS1 conducted a consensually audio and video recorded meeting with the Employee Coconspirator at the office of Trident Trade, Corp., at the direction of MARYNA. CHS1 provided the Employee Coconspirator with $3,000 worth of gift cards, and stated, "I didn't tell her how much I would bring. I wanted to bring about eight to ten now. But it did not work out to buy cards. They began to identify these devices that read cards." CHS1 then asked the Employee Coconspirator how other customers obtain gift cards before selling them at the office of Trident Trade, Corp. The Employee Coconspirator stated, "they work through the darknet in principle…The most difficult thing is to find those who provide this information." The Employee Coconspirator then provided CHS1 with $2,400 in cash in exchange for the gift cards.

---

[3] In a separate, related investigation, a witness stated that local criminals (often gang members) are involved in obtaining stolen personal information from the dark web. They use that stolen information and credit card information to purchase stolen gift card numbers.

11

30. From in or about 2021 through in or about 2023, companies operated and controlled by **MARYNA** and **OLEKSII** received at least $5 million of cash proceeds from their business of redeeming gift cards and money orders.

## CONCLUSION

31. Based upon the forgoing I submit that there is probable cause to believe that from in or about 2021, through the present, **MARYNA PETUSHKOVA** and **OLEKSII PETUSHKOV** engaged in a Conspiracy to Commit Money Laundering, in violation of Title 18 U.S.C. § 1956(h); and Operated a Money Transmitting Business Without a License, in violation of Title 18 U.S.C. § 1960.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Bert Ferguson
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 this 3rd day of April 2024

The Honorable Jared Strauss
United States Magistrate Judge

12